IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

OPPENHEIMER AND COMPANY, INC.,

    Plaintiff,

vs.

Case No. 06-2450-JTM

RED SPEEDWAY, INC., RED CAPITAL
DEVELOPMENT, L.L.C., and RED
DEVELOPMENT, L.L.C.,

    Defendants.

MEMORANDUM AND ORDER

    This matter is before the court on cross-motions for summary judgment by the plaintiff Oppenheimer and Company, and the defendants, RED Speedway, Inc., RED Capital Development, LLC, and RED Development, LLC. Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

    In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come

forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

Prior to the filing of this lawsuit, Oppenheimer and Co. Inc. merged into Fahnestock & Co., Inc. ("Fahnestock"), and then changed its name to Oppenheimer & Co. Inc. Both Oppenheimer and Fahnestock at all times relevant to this case have had offices at 4717 Grand, Kansas City, Missouri 64112.

RED Capital Development, LLC bid and originally began work on the commercial real estate development that eventually became known as The Legends at Village West in Wyandotte County, Kansas. RED Speedway, Inc. became the owner and the developer of the Legends Project ("Project") after Oppenheimer began performing services on the Project. RED Development, LLC was the vendor who provided contract development services to RED Capital, and later to RED Speedway. RED Development is a Missouri limited liability company separate and distinct from RED Speedway and RED Capital.

On April 28, 2003, Fahnestock submitted a written letter agreement to Dan Lowe of RED Capital in Missouri, who was the principal contact person for all defendants, engaging Rick Worner of Fahnestock as RED Capital's investment banker for the Project. The fee was $1 million, payable

in two installments. At the time the parties entered into the written agreement, construction of the Project was to be in two phases, known as Phase 1 and Phase 2.

The written agreement covered the services provided by Rick Worner through July 1, 2003–the date expected for Phase 2 funding. According to the affidavit by Worner, that date was selected because that was when Oppenheimer would have completed its services.

The written agreement did not precisely delineate the services Worner was to perform or the basis for the calculation of his pay. The agreement instead generally referred to providing investment banking services. Particularly, the written agreement did not specify that Oppenheimer was to pay 2% of the public bonds or incentives delivered for the Project.

The agreement provided: "The first payment of $500,000 is due upon the start of Phase 2 funding ... (expected July 1, 2003). The second $500,000 payment is due October 1, 2003." (Def. Exh. B). Oppenheimer has acknowledged that the payment dates were not exact. The first payment was to be made whenever Phase 2 funding occurred and the second payment to be made three months later. (Oppenheimer Depo, p. 129:12-7, attached hereto as Exhibit D).

Oppenheimer alleges that some time after May 15, 2003, but between the dates of June 1, 2003 and October 31, 2003, the parties made an express oral agreement that Oppenheimer would do some further work securing additional bonds for an additional $1,000,000. The defendants deny any new oral agreement and further payment. The allege that the written agreement was orally modified, but only to extend the timing of payment and the length of the scope of services to be performed.

On November 5, 2004, Oppenheimer delivered an invoice totaling $2,000,000 to Lowe. No specific RED entity was listed on the invoice, and the accompanying memo was addressed to "Red Development." This invoice broke work down into two period: 1) pre-July 1, 2003, and 2) July 1, 2003 and after. The invoice sought payment of $1,000,000 for each time period.

There is a factual dispute between the parties as to the extent to which the original written contract was orally modified. According to Worner, it never agreed to take less than $1 million for the work to be performed prior to July 1, 2003.

On or about September 9, 2005, a $1,000,000 check on a RED Speedway account was delivered to Oppenheimer and deposited. In connection with that check, Oppenheimer executed a Waiver and Release of Lien document and delivered it to one or more defendants. On its face, the Release covers "Investment Banking Services July 1, 2003 to the Present." While the Release only released RED Speedway, Oppenheimer has acknowledged that it covered all the RED entities. According to Lowe, the Release contained a clerical error, and that the parties intended the release to cover all work by Oppenheimer.

Lowe testified that he made it clear to Oppenheimer's agents, including Rick Worner, Brad Max, and Jack Holland, that RED would pay no more than $1 million for Oppenheimer's services. He testified to first meeting with Worner and Holland on or around November 5, 2004, where they presented an invoice for $2 million. Lowe "clearly stat[ed] that the agreement was for a million dollars, not for $2 million." (Lowe Dep. at 86). Asked about his contacts with Oppenheimer in disputing the $2 million invoice, Lowe testified that "I was a little more clear than I disputed it. I told them I wouldn't pay it, it wasn't agreed to, and left it at that." (*Id.* at 87).

After this meeting, Lowe also described a further conversation:

> I did have contact with Jack Holland once after our meeting in my office where we spoke by phone and I made it very clear to him that I was upset about the $2 million invoice and that all he would and Oppenheimer would receive for work provided on the Red project was a million dollars. So it's clear to me that he clearly understood he was only getting a million dollars for services provided. I also made it very clear to Brad when he came to pick up the check that the check would be for a million dollars for services provided on the project.

(*Id.* at 150-51).

Oppenheimer has acknowledged that all the work it performed after July 1, 2003, was billed for and paid by RED Speedway with its $1,000,000 check. It has also acknowledged that, for the second time period, it sought only $1,000,000 and did not care which defendant it came from, that

4

it would not collect money from one defendant and expect money from the other defendants or RED entities for the same work.

Oppenheimer makes claims against Defendants for services it alleges it performed before July 1, 2003, under three alternate theories:

a. Breach of the written agreement entered by RED Capital and Fahnestock (predecessor to Oppenheimer) dated April 28, 2003 and signed by Dan Lowe on May 13, 2003; with RED Capital and RED Speedway having assigned or assumed the obligations of the written agreement. Plaintiff seeks $1,000,000 under this theory.

b. Quantum meruit for services rendered to defendants before July 1, 2003. (Pretrial Order, 6.a(5) p. 9). Plaintiff seeks $1,000,000 under this theory.

c. Unjust enrichment, i.e., the benefit conferred and retained by defendants before July 1, 2003. Plaintiff seeks $1,000,000 under this theory.

Oppenheimer claims it had an agreement with the owner and developer of the Project for $1,000,000 for services rendered before July 1, 2003. It does not matter to Oppenheimer who among the defendants pays the $1,000,000 but is not seeking $1,000,000 from each of the three defendants.

RED Development did not assume any of the obligations of the written agreement between Oppenheimer and RED Capital. RED Development did not receive an assignment of the duties or benefits of the written agreement between Oppenheimer and RED Capital.

After the pretrial conference, Oppenheimer moved to amend its Complaint for the first time to add theories of unjust enrichment and quantum meruit against defendant RED Speedway, Inc. and RED Development, LLC for services rendered before July 1, 2003. In making its argument in favor of this amendment, Oppenheimber stated that the claims for unjust enrichment and quantum meruit should be capped because of the existence of a written contract for $1,000,000. On November 5, 2008, the Court granted Plaintiff's Motion, made amendments to the pretrial Order it had previously circulated, and held that the quantum meruit and unjust enrichment claims for the first time period – prior to July 1, 2003 – were capped at $1,000,000 because of the existence of an express contract for $1,000,000.

In reaching these findings of fact, the court finds that the affidavit submitted by Worner, cited by Oppenheimer in support of various denials of the defendants facts, is not admissible

evidence. The court finds that the affidavit, which seeks to assert that RED Development was more than simply an additional vendor to the Project, is conclusory, speculative, and contradictory. The affidavit asserts that the defendants have conceded that RED Development was a developer of the project, that Worner attended meetings at the RED Development offices in Kansas City, and that Dan Lowe never told him that Oppenheimer was *not* providing services to RED Development. The defendants have made no such concession; all of the RED entities have offices in the same location; and the burden is on Oppenheimer to show some affirmative conduct by RED Development or other apparent circumstances which would lead Oppenheimer to reasonably conclude that it was doing business with that company. It has not done so.

Oppenheimer makes claims against Defendants for services it alleges it performed beginning July 1, 2003, under three alternate theories:

    a.  Breach of an oral agreement allegedly entered by all three defendants after May 15, 2003 for services to be provided by Oppenheimer after June 30, 2003. Plaintiff seeks $1,000,000 under this theory.

    b.  Quantum meruit for services rendered to defendants after June 30, 2003. Plaintiff seeks $8,000,000 under this theory.

    c.  Unjust enrichment, i.e., the benefit conferred and retained by defendants after June 30, 2003. Plaintiff seeks $8,000,000 under this theory.

Oppenheimer is limiting its claim to $8,000,000 under either alternative theory. Among other defenses, Defendants have pled payment and release for both time periods.

Oppenheimer calculates both the value of the services performed after July 1, 2003 and the value of the benefit conferred upon defendants after July 1, 2003 by taking 7% of an assumed net profit of the sale of the Project of $110,000,000 which is the starting point of their calculation. The assumed net profit figure was derived from comments made by one Kevin Nunnink, who is not an employee of defendants, at a seminar. According to Oppenheimer, this $110,000,000 figure was not just profits, but also includes "various fees." (Resp. at 4).

Oppenheimer first became aware of this figure sometime before its designated representative Rick Worner was deposed. Despite having more than nine months to calculate them, Worner was unable to state what the net profits of the Project were at his deposition.

According to Oppenheimer's representative, a 7% contingency fee seems fair compared to what accountants have charged in the past for similar work and having heard anecdotally that attorneys charge contingency fees of 33% for unknown work. The only knowledge Oppenheimer has of what accountants have charged in the past for similar work is the accounting firm of Coopers & Lybrand having charged 20% to 25% on unnamed projects; it has produced no documents supporting this contention. The only knowledge Oppenheimer has of what attorneys charge for contingency fee work is what it has been told anecdotally. Oppenheimer and Worner never even believed they could seek a percentage of sale profits until they were told the day of Worner's deposition; it was certainly not within in their expectation until then, after the lawsuit was filed.

Oppenheimer's original calculation of its quantum meruit and unjust enrichment damages was $1,500,000, the sum presented in its Rule 26(a) disclosures which had not yet been amended prior to the defendant's motion for partial summary judgment.

It is uncontroverted that RED Development provided vendor development services to RED Capital and RED Speedway in connection with the Project. As such, RED Development was a vendor to RED Speedway, just as Oppenheimer claims it is a vendor to the RED entities acting as bidder and owner of the project. The services provided by Oppenheimer were provided to the owner and developer of the Project, not any of the vendors to the Project. Although RED Development performed development services for the Project, it was not the "owner/developer" of the Project.

**Conclusions of Law**

In its motion, the plaintiff seeks a determination that the Release entered into by the parties only released claims for work completed after July 1, 2003. It contends that any evidence suggesting modification or alteration of the explicit language of the Release is barred by the parol

evidence rule.  The defendants argue, however, that the parol evidence rule should not bar the introduction of evidence here showing the existence of a unilateral mistake.

The parties agree that Missouri law governs the nature of contractual relationship created by the Release.  Missouri law recognizes mistake as an exception to the general rule prohibiting parol evidence.  *Andes v. Albano*, 853 S.W.2d 936, 941-42 (Mo. 1993). Specifically, Missouri courts permit the introduction of parol evidence to show the existence of a unilateratal mistake, where the other party to the contract had reason to know of the error.  *Silver Dollar City, Inc. v. Kitsmiller Constr.*, 931 S.W.2d 909, 915 (Mo. Ct. App. 1996).

The court will deny Oppenheimer's motion, since a rational finder of fact could conclude that a unilateral mistake existed.  In its Reply, Oppenheimer correctly notes that the observation in *In re Hysinger*, 785 S.W.2d 619, 624-25 (Mo.App. 1990) that Missouri courts "show a lack of sympathy for a claim that one party did not understand the consequences of an act and, in general, courts are very reluctant to allow one party or his representative to avoid a document or agreement for a mistake that was not shared by the other."

In its Reply, Oppenheimer stresses that "other than Mr. Lowe's beliefs, no evidence, admissible or inadmissible, exists to show a prior agreement that the September 9, 2005 agreement fails to reflect." (Pl. Reply, at 4). But it is not the court's role to weigh the evidence. A rational finder of fact, if it found Lowe to be a particularly credible witness – and found plaintiff's witnesses to be not particularly credible – could reasonably conclude that the defendants were mistaken in assuming that the Release was a full release, and that a clerical error existed of which Oppenheimer should have known.

Oppenheimer misconstrues (Pl. Reply, at 6) *Silver Dollar City* to suggest that relief for a mistake may be accorded only where there is an ambiguous contract.  That decision's observation that "the parol evidence rule bars the admission of extrinsic evidence unless a contract is

8

ambiguous," 931 S.W.2d at 914, is merely a restatement of the rule itself,[1] it is not a repudiation of the doctrine of unilateral mistake as an *exception* to the rule. The *Silver Dollar City* court proceeded to quote its earlier decision in *Hysinger* recognizing that the Restatement (Second) Contracts § 153 "recognizes that relief may be given for a unilateral mistake when (a) the effect of the mistake is such that enforcement would be 'unconscionable' or (b) the other party had reason to know of the mistake." *Id.* at 915 (quoting *In re Hysinger*, 785 S.W.2d 619 (Mo. App. 1990). Section 153 Restatement does not restrict itself to ambiguous contracts; it applies even if the contract is otherwise unambigous.

Accordingly, the court will not bar the defendants from presenting evidence as to a unilateral mistake in the execution of the Release, consistent with Section 153 of the Restatement.

In its motion for partial summary judgment, the RED defendants seek dismissal of any claims against RED Development, on the grounds that it was merely a vendor of the project, and had no relations with the plaintiff. The defendants further seek to limit trial of the present matter to the narrow question of whether its payment of $1 million was intended as a resolution of all of Oppenheimer's claims against the defendants. Specifically, it seeks summary judgment on all the plaintiff's claims for services rendered after July 1, 2003, as a result of the Release entered into by the parties. Alternatively, it argues that the post-July 1, 2003 claims for unjust enrichment and quantum meruit cannot exceed $1 million, pursuant to the law of the case and the agreement of the parties. Finally, it argues that the claims, the unjust enrichment and quantum meruit claims for services whenever rendered, should be dismissed because there was an express agreement between the parties governing the work to be performed.

---

[1] "The parol evidence rule bars evidence of prior or contemporaneous oral agreements that vary or contradict the terms of an unambiguous, final, and complete writing, absent fraud, mistake, accident or duress." *Sherman v. Deihl*, 193 S.W.3d 863, 866 (Mo.App. S.D. 2006) (*quoting Building Erection Servs. Co. v. Plastic Sales Mfg. Co., Inc.*, 163 S.W.3d 472, 479 (Mo.App. W.D.2005)).

9

Oppenheimer agrees (Pl. Resp at 13) that Kansas law precludes the assertion of quantum meruit or unjust enrichment claims where a valid express contract exists. *See Fusion, Inc. v. Nebraska Aluminum Castings*, 934 F.Supp. 1270, 1275 (D. Kan. 1996). It argues, however, that these theories remain valid where the defendants essentially challenge the validity of the alleged oral contract providing for the payment of a second $1 million for post-July 1, 2003 services. Similarly, Oppenheimer argues that the Release would indeed release its claims for work after July 1, 2003, but that is only if the Release is enforced unambiguously as a Release for *only* post-July 1, 2003 work. That is, it argues that should the defendants succeed in their mutual mistake argument (that the Release was intended to cover claims for all services whenever rendered), the effect would be to render the Release a nullity, and therefore it would not bar the claims for quantum meruit or unjust enrichment.

Oppenheimer argues that Missouri law rather than Kansas law applies, since most of the meetings between the parties occurred in the offices of RED in Missouri (Pl. Resp. at 14). It argues that the May 2003 agreement does not bar the claims for unjust enrichment because it is advancing those claims against other RED entities who were not parties to the contract.

The court will grant summary judgment to the defendants as to the claims for payments for services rendered after July 1, 2003. Contrary to the argument of the plaintiff, the defendants' argument is not that the subsequent oral agreement is a nullity (thereby giving room for the assertion of quasi-contract remedies), but that the agreement should be reformed to reflect the intent of the parties. Both parties agree that the oral contract for a release exists, the only question is which claims were released – those for all services, whenever rendered, or for only those services rendered after July 1, 2003. The sole question is the intent of the parties as to the scope of the release. *See Slankard v. Thomas*, 912 S.W.2d 619, 624 (Mo. App. 1995).

As noted earlier, defendants present the alternative argument that, even if the Release were not present in the case, the court would grant summary judgment in favor of defendants as to the quasi-contract claims for services after July 1, 2003, holding that in no event could such claims be

advanced in excess of $1 million. Because the court finds that the Release is valid and forecloses any claims, however denominated, for services rendered after July 1, 2003, the court need not decide this issue.

The court does determine that the plaintiff's quasi-contract claims for services rendered prior to July 1, 2003 are barred because of an existing express contract governing the relations between the parties. Whether the court applies Kansas or Missouri law, the result is the same: such quasi-contract remedies are barred when an express contract exists between the parties. *See EEOC v. International Paper*, No. 91-2017-L, 1992 WL 370850 at \*9 (D. Kan. Oct. 28, 1992); *Roark Printing v. Worm World, Inc.*, 974 S.W.2d 613, 617 (Mo.App. S.D. 1998).[2]

Oppenheimer argues it should be permitted to advance alternative or inconsistent theories under the general rules of pleading. However, the circumstances of the case foreclose quasi-contract claims here. Both parties agree that an express contract governed the relations between the parties. According to Oppenheimer, that is the original $1 million written contract, as supplemented by the later claimed oral agreement for additional services and compensation of $1 million. According to the defendants, the original written agreement was modified by further oral contract providing the entire amount due would be $1 million. Neither party disclaims the original written contract. Accordingly, the court concludes that the claims for quantum meruit and unjust enrichment should be dismissed. *See Fusion, Inc. v. Neb. Aluminum Castings,* 934 F. Supp. 1270 (D. Kan. 1996)

---

[2]The court believes that Kansas law would govern the scope of any quasi-contract remedies available to the plaintiff. This court looks to Kansas choice-of-law principles to determine the relevant law, *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1942). Kansas follows the factors set forth in the RESTATEMENT (SECOND) OF CONFLICT OF LAW, § 221 to determine the law governing quasi-contract claims. *See Commander Properties Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 541 (D. Kan. 1995). Here, the services to be provided by Oppenheimer were directly tied to facilitating the construction of the Project in Kansas. Oppenheimer is a New York corporation; the defendants RED Capital and RED Speedway are Kansas corporations. Some of the parties' meetings occurred in Missouri, but that is the only Missouri connection to ths case. The court concludes that, on balance, the circumstances of the case support a finding that Kansas law should govern the plaintiff's quasi-contract remedies under § 221.

The court will also grant summary judgment in favor of defendant RED Development. This defendant had no contractual relations with Oppenheimer; the plaintiff's contract was with RED Capital. Oppenheimer's contract was to provide investment banking services to the owner and developer of the Project; RED Development was neither. There is no evidence that RED Development ever assumed the obligations and benefits of the contract between Plaintiff and RED Capital. The plaintiff has failed to show any evidence which would justify disregarding the separate corporate existence of RED Development.

IT IS ACCORDINGLY ORDERED this 19th day of February, 2009, that the defendants' Motion for Summary Judgment (Dkt. No. 66) is granted; the plaintiff's Motion for Summary Judgment (Dkt. No. 64) is denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE